## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

ROZEL OPERATING COMPANY     CIVIL ACTION NO. _____

VERSUS          JUDGE

CROWN POINT HOLDINGS, LLC

AND

INTERNATIONAL METAL RECYCLING, LLC     MAGISTRATE JUDGE

## **COMPLAINT**

The complaint of Rozel Operating Company ("Rozel") with respect represents:

1

Plaintiff is a corporation authorized to do and doing business in Louisiana, whose principal of business is in Lafayette, Louisiana.

2

Made defendant herein is Crown Point Holdings, LLC ("Crown Point"), a Louisiana limited liability company domiciled in Crown Point, Louisiana, whose registered agent is Joseph Dardar, 4881 Everard Street, Marrero, LA 70772.

3

Also made defendant herein is International Metal Recycling, LLC ("IMR"), upon information and belief, a Texas limited liability company not registered to do business in Louisiana.

4

Jurisdiction is proper under this Court's admiralty and maritime jurisdiction, and because the maritime salvage work at issue in this lawsuit, including all related actions

and omissions, were performed pursuant to that certain Judgment entered on January 18, 2013 by the Honorable Mary Ann Vial Lemmon, in that certain action styled *Cashman Equipment Corp. v Rozel Operating Co.*, et al, Civil Action No. 08-363, (the "Judgment"), Doc. 361, (attached hereto as Exhibit "A") under a suit originally filed in the United States District Court for the Middle District of Louisiana, which suit was reassigned and subsequently tried before Judge Lemmon sitting with a jury in the Eastern District ("the Cashman Litigation").  The subject of this action concerns funds currently being held in the Registry of the United States District Court for the Eastern District of Louisiana pursuant to the Order of that Court.  Additionally, this Court has supplemental jurisdiction over all claims asserted herein related to the claims within this Court's original jurisdiction under 28 U.S.C. 1367.

5

Rozel expressly designates this action for all purposes as one within the Court's admiralty or maritime jurisdiction pursuant to Federal Rule of Civil Procedure 9(h).

6

Venue is proper in the Eastern District because Crown Point is domiciled in the Eastern District and subject to this Court's personal jurisdiction. IMR is subject to this Court's personal jurisdiction as evidenced by its assertion of a claim in intervention in the Cashman Litigation (Doc. 420), and because a substantial portion of the property which is the subject of this action is situated in this judicial district, namely, approximately $1,118,664 of deposited funds currently being held in the Eastern District Court's Registry pursuant to the aforementioned Judgment by Judge Lemmon.

7

By way of background, in 2007, Rozel chartered a barge known as the JMC 109 from Cashman Equipment Corporation ("Cashman").  The JMC 109 was intentionally ballasted (filled with water) so that it sat on the seabed in shallow water off the coast of Cameron, Louisiana.  Due to a crack in the hull, the JMC 109 was unable to be deballasted off the seabed and has since remained there as wreckage.

8

In 2008, Cashman filed the main demand against Rozel, Continental Insurance Company ("Continental"), the insurer of the JMC 109's hull, and others, seeking to recover various damages for loss of the JMC 109.

9

Shortly before trial, Rozel and Cashman entered into a settlement agreement with Continental under which Continental agreed to deposit $1.5 million into the registry of the Court.  The parties agreed, in writing, the Continental funds would be paid to any party receiving a monetary judgment at trial, with all remaining funds ultimately payable to the party adjudged responsible to retrieve the barge from the bottom of the Gulf.  See Cashman Litigation, Docs. 325, 386-2, and 386-3 attached hereto as Exhibit "B" *in globo*.

10

In the Judgment, Rozel was adjudged obligated to salvage the JMC 109 from the bottom of the Gulf of Mexico at Block #2, West Cameron area, offshore Louisiana.  See Cashman Litigation, Doc. 361. [1]

---

[1] Stokes & Spiehler Offshore, Inc. was also adjudged so obligated, but Rozel singly undertook the salvage operation.

11

The Judgment further provided that certain excess funds held in the registry of this Court be reimbursed to Rozel once the JMC 109 was successfully salvaged pursuant to the settlement agreement by and between Rozel, Cashman and Continental. *Id.* at p.

12

The Fifth Circuit Court of Appeal affirmed the Judgment of the District Court (*Cashman v. Rozel*, 569 Fed. Appx. 283 (5th Cir. 2014) (*unpublished*)), and the Judgment became final. Rozel then initiated attempts to comply with the Judgment. On September 3, 2014, Rozel entered into a written contract with Crown Point for the salvage of the JMC 109 on a "No Cure / No Pay" basis, under which any and all payments by Rozel to Crown Point were conditioned and contingent upon the complete salvage of the JMC 109 from the bottom of the Gulf. (The "Salvage Agreement" attached as Exhibits C and D).

13

Under the express terms of the Salvage Agreement, Crown Point was obligated to separate the two wingwall sections (which had been joined together to make up the entire unit JMC 109), then deballast, and, if possible and feasible, *"float"* and transport each of the two separated wingwall sections to shore for sale/disposal at a suitable location as scrap.

14

The Salvage Agreement provided Rozel agreed to pay Crown Point a total cost in the amount of $1,050,000, following completion of the salvage, contingent upon complete retrieval of the two wingwall sections and subsequent delivery to an onshore location.

15

More particularly, the terms of the Salvage Agreement provided that Rozel agreed

to pay Crown Point:

    a.  a non-refundable initial cash mobilization fee of $150,000; plus

    b.  $400,000 on a "No Cure/No Pay" basis, due and payable contingent
       upon, and only if, one of the two wingwall units were successfully
       removed from the offshore location and brought onshore to be
       scrapped at a suitable location to be determined by Crown Point
       [defined in the Salvage Agreement as 'First Completion']; and

    c.  $500,000 on a "No Cure/No Pay" basis, due and payable contingent
       upon, and only if, the second and final wingwall section were
       successfully removed from the offshore location and brought onshore
       to be scrapped at a suitable location to be determined by Crown Point
       [defined in the Salvage Agreement as 'Second Completion'].

See Exhibit D.

16

A total of $900,000, representing the value of the two contingent payments

which would have been owed by Rozel in the event Crown Point successfully achieved

First and Second Completions, was placed by Rozel into an escrow account in a mutually

agreed upon financial institution.  *Id.* ("The Escrow").

17

The Salvage Agreement made plain Rozel was not responsible for making

payment of either of the two respective payments if, for any reason, First or Second

Completion could not be attained by Crown Point.  *Id.* The Salvage Agreement states:

    "If for any reason First Completion is unable to be attained
    (e.g., either wing wall unit cannot be removed), CPH will
    retain the $150,000 Mobilization Fee and shall not be
    entitled to any portion of the remaining $900,000 balance."
    Likewise, the Agreement also provides: "If for any reason
    Second Completion is unable to be attained, CPH will retain
    the $150,000 Mobilization fee and $400,000 of the Escrow

Amount paid to CPH if First Completion has been attained, but CPH shall not be entitled to any portion of the remaining $500,000 balance."

18

The Salvage Agreement expressly stated the total cost would never exceed $1,050,000, regardless of the encountering of unforeseen circumstances of any kind, and provided for a completion deadline of January 31, 2015, among other protections:

Notwithstanding any provision in the original Salvage Agreement or in this amendment: (i) the total cost for First Completion and Second Completion is $1,050,000 on a No Cure/No Pay basis consisting of the $150,000 earned Mobilization Fee, plus the $400,000 of the Escrow Amount upon First Completion on a No Cure/No Pay basis as set forth above, plus the $500,000 remaining Escrow Amount on a No Cure/No Pay basis as set forth above; (ii) in no event, and under no circumstances, will CPH, LLC be entitled to make any claim for any change order and/or increase in the price of any of the salvage work within the scope of the Salvage Agreement, as amended herein, regardless of unforeseen circumstances of any kind and/or the accuracy of the information supplied by Rozel to CPH, and (iii) in the event First Completion and/or Second Completion cannot be attained by January 31, 2015, subject to the force majeure delays described in the Salvage Agreement, Rozel may, at Rozel's sole option and discretion, terminate Salvage Agreement with respect to any unfinished work.

The written Salvage Agreement and this amendment constitute the sole, complete, exclusive and entire agreement among the parties with respect to the subject work, and no verbal agreements or other written documents are a part hereof. No modification, rescission, or waiver of any terms of this Agreement shall be effective without written amendment referencing the Salvage Agreement and this amendment and duly executed by an authorized representative of Rozel and CPH. The failure of any party to insist upon strict performance of any provision hereof shall not constitute a waiver of or estoppel against asserting the right to require such performance in the future, nor shall a waiver or estoppel in any one instance constitute a waiver or

estoppel with respect to a later breach of a similar nature or otherwise.

Exhibit D.

19

Work commenced under The Salvage Agreement sometime in late 2014 or early 2015. By letter of January 13, 2015, Troy Villa, counsel for Crown Point, represented to Rozel in writing that First Completion had been achieved by Crown Point and that Crown Point had successfully floated the first wingwall section and removed it from the location:

> **On behalf of [CPH]**, I wish to provide this written notice to [Rozel] that...**CPH has successfully floated and removed the first barge from the salvage location**. In accordance with the [Agreement], **CPH has achieved First Completion** (as defined in the Amendment) and makes demand on Rozel to promptly join CPH in executing the attached Joint Written Instructions to the Escrow Agent to release to CPH $400,000 of the Escrow Amount...."

Exhibit E (emphasis added).

20

In an email from Villa to counsel for Rozel that same day, Crown Point's counsel stated, "I'm now told the barge is in route (in a hopper barge) to CPH's yard in Crown Point, LA." Exhibit F.

21

To ensure and evidence First Completion had indeed been achieved, and to ensure Rozel was able to furnish proper evidence to this Court to support its claim for reimbursement of the registry funds, Rozel secured an Affidavit of Crown Point's

President, Joseph Dardar, dated January 20, 2015, in which Dardar attested to the following:

> As of January 19, 2015, **_CPH successfully salvaged and retrieved one of the two Barges from the offshore location.  This Barge has been transported away from the salvage location to a temporary inland position in Cameron Parish, Louisiana_**.  CPH conducted an excavator sweep of the water bottom where this Barge was sunken and did not locate any additional material from this Barge,

Dardar further attested:

> **_CPH will continue efforts to retrieve the second Barge pursuant to the terms and conditions of the August 28, 2014 Salvage Agreement_**, as amended on December 15, 2014.

Exhibit G.

### 22

In reliance on both the representations of Villa and Dardar's Affidavit, Rozel authorized release to Crown Point of $400,000 of the escrow funds.

### 23

After certifying First Completion had been attained, Crown Point repeatedly reported to Rozel that the achievement of Second Completion was merely days away, but that weather and various equipment problems had impeded rapid progress. As early as February 19, 2015, in an email from Joseph Dardar, Crown Point represented to Rozel that the "**_job is 95% finished_** / we are attempting to clean up the last bit of debris around the site / we again have bad whether (sic) we will be needing to the end of the week the 27th to complete the job…"  Exhibit H.

24

After months of awaiting Second Completion, and long after the January 31, 2015 extended deadline for Second Completion had passed, with little to no activity on the part of Crown Point, Rozel issued written notice to Crown Point, on July 22, 2015, formally confirming termination of the Salvage Agreement and demanding return of the remaining $500,000 of escrow funds.  Exhibit I.

25

Crown Point failed to achieve Second Completion, and the remaining $500,000 of escrow funds rightfully belongs to Rozel under the terms of the Salvage Agreement.

26

Despite amicable demand, Crown Point has refused to authorize release of the remaining portion of the escrow funds to Rozel.  Rozel seeks judicial enforcement of the Salvage Agreement from this Court and prays for Judgment ordering release of all remaining escrow funds to Rozel because of Crown Point's failure to fulfill its obligations under The Salvage Agreement.

27

To the extent Crown Point failed to achieve First Completion, notwithstanding its sworn representations to the contrary, such failure would amount to breach of contract, bad faith, misrepresentation and fraud based upon the sworn affidavit by Crown Point and the written representations by its attorney, Crown Point is indebted to Rozel in the amount of $400,000 already paid to Crown Point in reliance upon Crown Point's written and sworn representations of having achieved First Completion, in addition to the $150,000 mobilization fee paid by Rozel to Crown Point, plus attorneys' fees, costs and other equitable damages for Crown Point's breach.

* * * * * *

28

Unbeknownst to Rozel, Crown Point used several subcontractors to assist in the performance of work under the Salvage Agreement, principal among which was a Texas-based salvage company by the name of IMR.

29

Rozel was totally unaware of IMR's involvement in the salvage operation until July 22, 2015, when Rozel's lawyer received a telephone call from IMR's lawyer stating IMR had stopped work on the project because Crown Point was allegedly $900,000 in arrears on payment of invoices IMR had submitted to Crown Point for this job.  IMR represented to Rozel that Crown Point had subcontracted IMR to perform some of the salvage work, and that Crown Point owed IMR substantial sums for work IMR performed on the project.

30

Contrary to IMR's allegations in its intervention papers, Crown Point has represented to Rozel that Dean Schroeder, not IMR, agreed to perform the work for Crown Point on a lump sum basis for $250,000.

31

At no time prior to July 22, 2015 did Crown Point advise Rozel it had subcontracted the salvage work to either IMR or Dean Schroeder. At no time did Rozel contract or have any financial dealings with IMR.

32

It was not until late July 2015, when IMR discovered Crown Point had actually contracted with Rozel, that IMR contacted Rozel and claimed IMR had been working on

the project since early February 2015, having been subcontracted by Crown Point.  IMR advised Rozel that Crown Point owed IMR nearly $900,000 for invoices dating back to February 23, 2015.

33

On September 11, 2015, IMR filed a petition to intervene in the Cashman lawsuit, claiming a "substantial financial interest in funds held in the registry of the court for payment and/or reimbursement of costs to Rozel for retrieval of the vessel IMC 109 pursuant to the Court's Judgment entered on January 18, 2013.  Cashman Litigation, Doc. 361.

34

In its proposed Complaint, IMR confirmed to this Court that "nearly ninety percent of the vessel JMC 109 had been retrieved from the seabed." *Id*. at Doc. 420-2, p. 18.

35

IMR's petition to intervene was denied by Magistrate Judge Shushan.

36

On or about January 12, 2016, IMR filed an "Oil and Gas Lien and Statement of Claim" attached as Exhibit J ("the Lien"),  claiming IMR is owed $876,000 and claiming to preserve a lien under the Louisiana Oil Well Lien Act ("LOWLA") against Well Serial Number 237827, Cameron Parish, Creole Field (3008), Well Name VUB SL 18251 No. 2 and Well Serial Number 237828, Cameron Parish, Creole Field (3008), SL 18251 No. 3 ("the Wells").

37

The Lien is patently invalid, fails to meet the statutory requirements of LOWLA, and was filed in bad faith for various reasons, including but not limited to the following:

(1) At no time did IMR perform any work for the Wells;

(2) At no time did IMR perform work at the site(s) of the Wells;

(3) IMR was not a "contractor" for purposes of the LOWLA;

(4) Rozel was not the "operator" for purposes of LOWLA;

(5) Rozel never contracted with IMR.

38

Rozel prays for Judgment declaring the Lien invalid, ordering IMR to immediately cancel and remove the Lien from any pertinent mortgage, conveyance or other records where it may have been filed, and ordering IMR to pay Rozel all damages, attorney fees and costs arising out of IMR's wrongful filing of the Lien.

39

Alternatively, to the extent IMR is successful in any claim against Rozel and/or the assets of Rozel and/or the owners of the Wells, whether directly or indirectly (including but not limited to any lien claim against the Wells or claims against the deposited funds in the Court's registry in the Cashman Litigation), all of which is expressly denied, Crown Point is liable to Rozel for such amounts and all resulting damages.

40

WHEREFORE, Rozel Operating Company prays for an expedited hearing and/or trial on all matters asserted herein, and for Judgment in its favor against Crown Point Holdings, LLC and International Metal Recycling, LLC for all damages and relief

available to Rozel arising out of the foregoing facts and circumstances, including but not limited to:

    a.  Judgment against Crown Point Holdings, LLC, declaring Rozel is solely entitled to reimbursement of all remaining escrow funds amount on deposit at Coastal Commerce Bank pursuant to the Escrow Agreement;

    b.  To the extent Crown Point Holdings, LLC failed to achieve First Completion, Judgment rescinding the Salvage Agreement and adjudging Crown Point Holdings, LLC liable and indebted to Rozel in the amount of $400,000 paid to Crown Point in reliance on Crown Point's representations of having achieved First Completion, plus the $150,000 mobilization fee paid by Rozel to Crown Point, in addition to attorneys' fees, costs and other equitable damages for Crown Point's breach, bad faith, fraud and/or fault;

    c.  Judgment declaring the Lien filed by IMR to be invalid, ordering IMR to immediately cancel and remove the Lien from any pertinent mortgage, conveyance or other records where it may have been filed, and ordering IMR to pay Rozel all damages, attorney fees, and costs arising out of IMR's wrongful filing of the Lien;

    d.  To the extent IMR is successful in any claim against Rozel and/or the assets of Rozel and/or the owners of the Wells, whether directly or indirectly (including but not limited to any lien claim against the Wells or claims against the deposited funds in the Court's registry in the Cashman Litigation), all of which is expressly denied, Judgment in favor of Rozel and against Crown Point, adjudging Crown Point Holdings, LLC indebted to Rozel for all such amounts and all resulting damages, and

e.  All appropriate orders necessary and proper to effect the foregoing, as well as

all lesser, included general and equitable relief.

Respectfully submitted,

MAHTOOK & LAFLEUR

_s/Cliffe E. Laborde III_
Cliffe E. Laborde III - #08062
1000 Chase Tower
600 Jefferson Street
Lafayette, Louisiana  70502
Post Office Box 3089
Phone:  (337) 266-2189
Fax: (337) 266-2303

AND

NEUNERPATE

_s/Brandon Letulier_
Brandon W. Letulier #28657
Cliff A. LaCour #30581
One Petroleum Center, Suite 200
1001 West Pinhook Road
Lafayette, Louisiana  70503
Telephone: (337) 237-7000
Fax: (337) 233-9450

Attorneys for Rozel Operating Company