UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ROZEL OPERATING COMPANY                    CIVIL ACTION

VERSUS                                      NO: 16-1687

CROWN POINT HOLDINGS,                       SECTION: "J"(1)
LLC, ET AL.

## ORDER & REASONS

Before the Court is Rozel Operating Company's (Rozel) *Motion for Partial Summary Judgment against Crown Point for Release of Remaining Escrow Funds* **(R. Doc. 39)**, an opposition thereto filed by Crown Point Holdings, LLC (Crown Point) **(R. Doc. 42)**, a reply filed by Rozel **(R. Doc. 54)**, and a supplemental memorandum filed by Crown Point **(R. Doc. 52)**. Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that the motion should be **GRANTED**.

## FACTS AND PROCEDURAL BACKGROUND

This action arises out of the alleged breach of a salvage agreement. In 2007, Rozel chartered a barge known as the JMC 109 from Cashman Equipment Corporation (Cashman). (R. Doc. 1 at 3.) The JMC 109 is comprised of two barge units, each made of steel plated wing wall sections from a World War II Navy Dry Dock, measuring one-hundred and five feet in length, forty-eight feet in height, and eighteen feet in depth. (R. Doc. 1-5, at 1.) The JMC 109 was intentionally ballasted so that it sat on the seabed in

shallow water off the coast of Cameron, Louisiana. (R. Doc. 1 at 3.) Due to a crack in the hull, the JMC 109 was unable to be recovered and has since remained on the seabed. *Id.* In 2008, Cashman filed suit against Rozel seeking various damages for the loss of the JMC 109. *Id.* On January 18, 2013, District Judge Mary Ann Vial Lemmon issued a judgment and ordered Rozel to retrieve the JMC 109 from the bottom of the Gulf of Mexico. (R. Doc. 39-4.) To comply with the order, Rozel entered into a written agreement with Crown Point to salvage the JMC 109. *Id.* Under the initial agreement, Crown Point was to have the first barge afloat within five days of Crown Point commencing work at the site, and the second barge was to be afloat within ten days from the salvage of the first barge. *Id.* Subject to force majeure exceptions described within the agreement, the recovery of both barges was not to exceed thirty days from Crown Point commencing work at the site. *Id.* at 2. The total cost to complete salvage was eight-hundred and fifty-thousand dollars ($850,000). *Id.* This $850,000 was comprised of a $150,000 "mobilization and demobilization" payment upon execution of the agreement, and the remaining $700,000 was placed in an escrow account. *Id.* at 3. The initial agreement provided that the salvage price of $700,000 was "due and payable contingent upon, and only if, both wing walls are removed from their current offshore location and brought to shore for scrap at a suitable location as determined by [Crown Point]. . . . If for

2

any reason Completion is unable to be attained . . . Crown Point will retain the $150,000 mobilization and demobilization cost and shall not be entitled to any portion of the remaining $700,000 balance." *Id.* Crown Point was to commence work by approximately September 16, 2014. *See id.*[1]

Crown Point did not commence operations until October 8, 2014. (R. Doc. 39-9 at 2.) On December 18, 2014, after Crown Point reported having difficulty retrieving the JMC 109, the parties amended the initial agreement. (R. Doc. 39-10.) Specifically, while the mobilization and demobilization fee remained the same, the salvage price was increased to nine-hundred thousand dollars ($900,000). *Id.* However, payment of the $900,000 was to be disbursed in two stages. First, four-hundred thousand (400,000) was to be made payable contingent upon, and only if, one of the two wing wall units was removed and brought to shore (First Completion). *Id.* If for any reason neither of the two wing wall units was unable to be removed, Crown Point would be entitled to the $150,000 mobilization and demobilization payment, but would not be entitled to any portion of the $900,000 in escrow. *Id.* In the event that First Completion was attained, payment of the

---

[1] Rozel's memorandum states that Crown Point was to commence work by September 16, 2014. (R. Doc. 39-3 at 3.) However, the agreement provides that Crown Point was "required to begin mobilization and be in route to the salvage location no later than ten business days from the execution of the agreement." (R. Doc. 1-5 at 3.) The agreement is dated September 2, 2014, thus making the date of commencement, at the latest, September 13, 2014. Nevertheless, Crown Point did not commence operations under October 8, 2014. (R. Doc. 39-9 at 2.)

3

remaining five-hundred thousand dollars ($500,000) in escrow was payable and contingent upon, and only if, the second wing wall unit was removed and brought to shore (Second Completion). *Id.* If Second Completion could not be attained, Crown Point would be entitled to retain the $150,000 mobilization and demobilization cost and the $400,000 for First Completion, but Crown Point would not be entitled to any of the remaining $500,000 in escrow. *Id.* The amended agreement also provided:

> All other terms and conditions of the [initial agreement] which are not inconsistent with [the amended agreement], including but not limited to the No Cure/No Pay basis of work, shall remain in full force and effect. . . . In the event [both wing wall units cannot be retrieved in accordance with the agreement] by January 31, 2015, subject to force majeure delays described in the [initial agreement] Rozel may, at Rozel's sole option and discretion, terminate [the initial agreement] with respect to any unfinished work.

*Id.* Crown Point informed Rozel that it attained First Completion on January 20, 2015. (R. Doc. 39-12.) On that same day, Rozel authorized the payment of $400,000 from the escrow account to Crown Point. (R. Doc. 39-14.) On January 30, 2015, Crown Point requested an extension of the project deadline to attain Second Completion. (R. Doc. 39-15.) Rozel agreed to extend the deadline from January 31, 2015 to February 20, 2015. *Id.* After making several unanswered inquiries as to the status of the project, on July 22, 2015, Rozel gave formal notice that the salvage agreement was terminated and demanded that Crown Point release the $500,000 in escrow. (R. Doc.

4

39-19.) Crown Point refused to release the $500,000 remaining in escrow.

On February 29, 2016, Rozel filed suit against Crown Point Holding. (R. Doc. 1.) On August 23, 2016, Rozel filed a motion for partial summary judgment. (R. Doc. 39.) In short, Rozel argues that Crown Point has failed to attain Second Completion, and that Rozel is therefore entitled to the $500,000 remaining in escrow. *See id.* In response, Crown Point argues that two issues of material fact exist which preclude summary judgment: 1) Whether any portion of the JMC 109 remains at the salvage site; and 2) Whether bad weather conditions at the salvage site created unsafe conditions which prevented or delayed Crown Point from achieving Second Completion. *See* (R. Doc. 41 at 3-4.) Rozel's *Motion for Partial Summary Judgment against Crown Point for Release of Remaining Escrow Funds* is now before the Court on the briefs and without oral argument.

## PARTIES' ARGUMENTS

### 1.   Plaintiff's Arguments

First, Rozel argues that there is no genuine issue of material fact that Crown Point failed to attain Second Completion. (R. Doc. 39-3 at 5.) Specifically, Rozel argues that the survey conducted by Oceaneering International Company (Oceaneering International) reveals that portions of the second barge still remain on the seabed. Because Second Completion has not been attained, and

5

because the parties' agreement contained a no cure/no pay provision, Rozel argues that Crown Point is not entitled to any of the $500,000 remaining in escrow. *Id.* at 6. The no cure/no pay provision states that the remaining $500,000 is "payable contingent upon, and only if, the second and final wing wall unit is removed" and "if for any reason second completion is unable to be attained . . . [Crown Point] shall not be entitled to any portion of the remaining $500,000 balance." *Id.* at 7. Rozel argues that this clause precludes Crown Point from receiving any of the $500,000 remaining in escrow.

As to Crown Point's argument that the weather at the salvage site created unsafe working conditions, Rozel argues that this assertion contradicts Crown Point's initial argument that Second Completion has occurred. (R. Doc. 39-5 at 3.) Rozel also argues that it was entitled to terminate the agreement if Crown Point did not complete the project by February 20, 2015, subject only to force majeure events explicitly delineated within the parties' agreement. Rozel argues that Crown Point's generic statements that "weather at the site for the majority of February through July 2015 created conditions unsafe" and "weather conditions at the salvage site delayed the completion of the salvage project due to unsafe working conditions" is insufficient evidence, alone, for Crown Point to survive summary judgment.

2.   **Defendant's Arguments**

Crown Point argues that the evidence presented by Rozel does not conclusively prove that portions of the JMC 109 remain at the salvage site. (R. Doc. 42 at 4.) Further, Crown Point argues that "Rozel has provided no jurisprudential support for its assertion that Crown Point shall receive no compensation on the 'No-Cure No-Pay' terms of the contract." *Id.* at 5. Because the JMC 109 was to be salvaged for scrap, Crown Point argues that it is entitled to a portion of the remaining $500,000 for its substantial completion of the job. *Id.* Crown Point further argues that the affidavit of Joseph Dardar, the manager of Crown Point, creates a genuine issue of fact as to whether any portion of the JMC 109 remains on the seabed.

Crown Point also argues that a genuine issue of material fact exists as to whether bad weather conditions at the salvage site created unsafe conditions, excusing its delayed performance. *Id.* at 3. Crown Point argues that "[a]fter adequate discovery has been conducted on this issue, Defendant will show at trial that weather at the salvage site created dangerous conditions that delayed the attainment of Second Completion." *Id.* Crown Point argues that it cannot be penalized for delays arising from unsafe working conditions pursuant to the parties' agreement. *Id.* Accordingly, Crown Point argues that Rozel's motion should be denied

## <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either

8

Case 2:16-cv-01687-CJB-JVM   Document 62   Filed 10/20/16   Page 9 of 17

countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g.*, *id.* at 325; *Little*, 37 F.3d at 1075.

## DISCUSSION

The first issue before the Court is whether a genuine issue of material fact exists as to whether Crown Point has accomplished Second Completion. In order to resolve this issue, the Court must determine which party would have the ultimate burden of proof at trial on this issue. Rozel filed this motion arguing that Crown Point breached the parties' agreement. The agreement provides that Louisiana law and general maritime law govern the agreement. (R. Doc. 39-5 at 3.) Under Louisiana law, "[t]he burden of proof in an

action for breach of contract is on the party claiming rights under that contract." *Terry F. Day v. Moore*, No. 2001-1447, p. 3 (La. App. 4 Cir. 3/27/02); 815 So.2d 335, 338 (citing *Rebouche v. Harvey*, 2001-2327 (La. App. 4 Cir. 12/91/01); 805 So.2d 332. Rozel claims it is entitled to the $500,000 remaining in escrow because Crown Point has not attained Second Completion. Accordingly, Rozel bears the ultimate burden of proving Crown Point breached its obligations under the agreement. For Rozel to succeed on its motion for summary judgment it must first "come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop*, 939 F.2d at 1264-65; *Terry F. Day*, 815 So.2d at 338 (citing La. C.C. art. 966(D)(1)).

Rozel argues that the testimony of Ralph Coleman, a land surveyor employed by Oceaneering International, proves that Crown Point has not attained Second Completion. (R. Doc. 54.) Mr. Coleman conducted a sonar survey to determine whether any remnants of JMC 109 remained on the seabed of the Gulf of Mexico. Before conducting the survey, Crown Point provided Oceaneering International with the historical coordinates of the JMC 109. (R. Doc. 52-1 at 19.) Based on this information, Mr. Coleman and Oceaneering International determined that remnants of the JMC 109 remained at the site. *See id.* at 17-20; R. Doc. 54-1. Specifically, Oceaneering International identified three different remnants of the JMC 109: one segment approximately twenty-feet by twenty-feet, another

10

thirty-feet by forty-feet, and another fifty-feet by seventy-feet. (R. Doc. 54-1.) Neither Mr. Coleman nor Oceaneering International were able to determine the composition of the objects identified in the survey.

In response, Crown Point makes two arguments. First, Crown Point argues that the survey conducted by Mr. Coleman "does not conclusively show that any remnants of the JMC 109 exist at the salvage site." (R. Doc. 52 at 2.) Specifically, Crown Point argues that because Mr. Coleman was unable to identify the composition of the objects on the seabed, Oceaneering International's determination that such remnants were the JMC 109 is merely speculation. *Id.* at 3. Consequently, Crown Point argues that Rozel has not satisfied its burden of proving that Crown Point failed to attain Second Completion. Second, Crown Point argues it has rebutted Rozel's summary judgment evidence through the affidavit of Mr. Dardar. (R. Doc. 42-4.) Mr. Dardar's affidavit states that he "conducted a Side-Scan Sonar Survey where the sunken JMC 109 was located, and [he] detected no remnants of the JMC 109." *Id.* at 2. Crown Point did not submit a survey report, but rather relies solely on Mr. Dardar's statement to support its argument that it has achieved Second Completion.

The Court finds that Rozel has submitted sufficient evidence that portions of the JMC 109 remain on the seabed of the Gulf of Mexico. The deposition testimony of Mr. Coleman and the survey

11

conducted by Oceaneering International demonstrate that large remnants of at least one, if not both, of the barges remains at the original site. Accordingly, the burden now shifts to Crown Point to rebut this evidence and demonstrate a genuine issue of material fact remained. *See Int'l Shortstop*, 939 F.2d at 1265. Under Rule 56, the party opposing summary judgment cannot satisfy its burden of proving a genuine issue of material fact by merely asserting, by affidavit or otherwise, that a genuine issue exists for trial. *See* 8 Wright & Miller, Federal Practice & Procedure § 2727.2 (4th ed.). "Conclusory allegations supported by a conclusory affidavit will not suffice to require a trial." *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 7 F.3d 1203, 1206-07 (5th Cir. 1994) (quoting *Shaffer v. Williams*, 794 F.2d 1030, 1033 (5th Cir. 1986)); *see also*, *Broadway v. Montgomery*, 530 F.2d 657, 650 (5th Cir. 1976) (nonmovant's affidavit reciting unsupported, conclusory allegations insufficient to avoid summary judgment). Evidence in opposition to the motion that clearly is without any force is insufficient to raise a genuine issue. *See* Wright & Miller, Fed. Prac. & Pro. Civ. § 2727.2 (4th ed.) (citing cases). Further, a party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary. *See Helia Tec Res., Inc. v. GE & F Co., Ltd.*, No. 09-1482, 2013 WL 3157534, at *2-3 (S.D. Tex.

June 19, 2013) (citing *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006); *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000)).

Mr. Dardar's affidavit states that,

> At all material times, [he] was the Manager of [Crown Point], and in that capacity, [he has] personal knowledge of the facts set forth in Crown Point's Opposition to Rozel's Motion for Partial Summary Judgment, as well as the Memorandum and Exhibits attached thereto. Every statement therein is within [his] personal knowledge and is true and correct. . . . On or about May of 2016, [he] conducted a Side-Scan Sonar Survey at the coordinates where the sunken JMC 109 was located, and [he] detected no remnants of the JMC 109.

(R. Doc. 42-4, at 1-2.) Notably, Mr. Dardar's affidavit does not state that there are no remnants of the JMC 109 at the site. Further, Mr. Dardar's statement is unsupported by any evidence within the record. Crown Point did not submit a survey to rebut Oceaneering International's survey, which depicted several large portions of the JMC 109 remaining on the seabed. Further, the Court must note that it seems highly unusual that Mr. Dardar would argue that Crown Point has achieved Second Completion, yet has raised no argument that it is entitled to the entire $500,000 remaining in escrow nor ever requested Rozel release the $500,000. In fact, Rozel contacted Crown Point several times in early to mid-2015 inquiring about the status of the JMC 109 and did not receive a response. (R. Doc. 38-18.) Accordingly, the Court finds that Mr. Dardar's self-serving and unsupported affidavit does not preclude summary judgment. *See Helia*, 2013 WL 3157534, at *2-3 (citing

*Warfield*, 436 F.3d at 559; *In re Hinsley*, 201 F.3d at 643). Thus, there is no genuine issue of material fact that Crown Point has failed to achieve Second Completion.

Crown Point also argues that summary judgment is inappropriate because "the weather conditions at the salvage site from February of 2015 through July of 2015 created conditions that would make continuing salvage operations dangerous." (R. Doc. 42 at 3.) Crown Point argues that, pursuant to the initial agreement, it cannot be penalized for delays arising from unsafe working conditions. *Id.* The initial agreement provided that Crown Point was not required to work in unsafe weather conditions, and that Crown Point would not be penalized for stoppage due to such unsafe conditions. (R. Doc. 39-5 at 3.) However, the parties' amended agreement provides:

> All other terms and conditions of the [initial agreement] which are not inconsistent with this Amendment, including but not limited to the No Cure/No Pay basis of work, shall remain in full force and effect. **Notwithstanding any provision in the [initial agreement]** . . . in the event First Completion and/or Second Completion cannot be attained by [February 20, 2015],[2] **subject to the force majeure delays described in the [initial agreement], Rozel may, at Rozel's sole option and discretion**, **terminate Salvage Agreement with respect to any unfinished work.**

(R. Doc. 39-10) (emphasis added). Thus, the amended agreement gave Rozel the unilateral right to terminate the agreement, subject

---

[2] The parties agreed to extend the deadline from January 31, 2015 to February 20, 2015. (R. Doc. 39-15.)

only to force majeure delays enumerated in the initial agreement,
if the project was not completed by February 20, 2015. The force
majeure delays enumerated in the initial agreement included
"severe storm, hurricane, tornado, or other natural disaster." (R.
Doc. 39-5.) Without a scintilla of evidence, Mr. Dardar's
unsupported statement that the weather conditions were dangerous
and prohibited timely completion does not show that force majeure
conditions were present which prohibited Rozel from terminating
the agreement after February 20, 2015. See *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 246-52 ("The mere existence of a
scintilla of evidence . . . is insufficient" to defeat summary
judgment.").

Further, even assuming that the "no penalty" provision[3] within
the parties' initial agreement was not extinguished by the parties'
amended agreement, Mr. Dardar's unsupported, self-serving
affidavit is insufficient to preclude summary judgment. *See
Broadway*, 530 F.2d at 650 (nonmovant's affidavit reciting
unsupported, conclusory allegations insufficient to avoid summary

---

[3] The "no penalty" provision states that "[a]ny stoppage of work due to unsafe
conditions, [Crown Point] will not be penalized." (R. Doc. 39-5 at 3.) The
amended agreement provided that, "All other terms and conditions of the [initial
agreement] which are not inconsistent with [the amended agreement], including
but not limited to the No Cure/No Pay basis of work, shall remain in full force
and effect." (R. Doc. 39-10.) Thus, to the extent that the parties' intended
cancellation of the agreement to be a penalty, it appears that the amended
agreement extinguished the initial agreement's "no penalty" provision, because
the "no penalty" provision is inconsistent with the amended agreement which
provided Rozel the sole discretion to terminate the agreement if the project
was not completed by February 20, 2015.

judgment). There is no evidence within the record, other than Mr. Dardar's own statement, to support Crown Point's argument that the weather created unsafe conditions excusing Crown Point's performance. Accordingly, Crown Point has not produced sufficient evidence to show its failure to attain Second Completion was excused by force majeure or that it cannot be "penalized" due to unsafe weather conditions.

The parties' amended agreement provides:

> In the event First Completion is attained, payment of the remaining $500,000 of the Escrow Amount shall be made to [Crown Point] on a No Cure/No Pay **basis due and payable contingent upon, and only if** the second and final wing wall unit is removed from its current offshore location and brought to shore for scrap at a suitable location as determined by [Crown Point]. . . . **If for any reason Second Completion is unable to be attained**, [Crown Point] will retain the $150,000 Mobilization Fee and $400,000 of the Escrow Amount paid to [Crown Point] if First Completion has been attained, but **[Crown Point] shall not be entitled to any portion of the remaining $500,000 balance**.

(R. Doc. 39-10) (emphasis added). Because the Court finds that Crown Point has not attained Second Completion, and that force majeure did not prevent Rozel from terminating the agreement approximately six months after the extended deadline, the Court finds that Crown Point is entitled to retain the $150,000 mobilization and demobilization fee and the $400,000 for First Completion. However, pursuant to the parties' agreement, Crown Point is not entitled to any portion of the $500,000 in escrow.

## CONCLUSION

Accordingly,

    **IT IS HEREBY ORDERED** that Plaintiff's *Motion for Partial Summary Judgment against Crown Point for Release of Remaining Escrow Funds* **(R. Doc. 39)** is **GRANTED**.

    New Orleans, Louisiana this 20th day of October, 2016.

                                    _____
                                    CARL J. BARBIER
                                    UNITED STATES DISTRICT JUDGE